FILED
United States Court of Appeals
Tenth Circuit

January 23, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

SECSYS, LLC, a New Mexico Limited
Liability Company,

      Plaintiff-Appellant,

v.

ROBERT VIGIL and ANN MARIE
GALLEGOS, in their individual
capacities,

      Defendants-Appellees.

No. 11-2006

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:07-cv-00664 DJS-RLP)

Paul J. Kennedy (Arne R. Leonard with him on the briefs), of Kennedy & Han,
P.C., Albuquerque, New Mexico, for Plaintiff-Appellant.

Stephen S. Hamilton (Holly Agajanian and Hans Erickson with him on the brief),
of Montgomery & Andrews, P.A., Santa Fe, New Mexico, for Defendants-
Appellees.

Before **MURPHY,** Circuit Judge, **BRORBY,** Senior Circuit Judge, and
**GORSUCH**, Circuit Judge.

**GORSUCH**, Circuit Judge.

Public officials using the power of their perches to wring money and favors from those they are supposed to serve is a problem as old as government itself. But the problem hardly persists for a lack of effort to eradicate it. Cicero tried to expunge extortion from the public arena when he prosecuted the plundering Roman governor Gaius Verres, and we do much the same today when we prosecute plundering governors of our own (*see, e.g.*, *United States v. Blagojevich*, 1:08-cr-00888-1 (N.D. Ill. 2011)). The common law contains many and ancient proscriptions against extortion. Diverse and modern statutes against the practice can be found on the books of our federal and state governments alike. There are criminal laws against extortion and civil ones, too. But until now, nearly 150 years after the Fourteenth Amendment's adoption, it's never been thought that extortion *also* violates the Constitution's Equal Protection Clause as a matter of course. That, however, is the novel theory the plaintiff asks us to endorse in this case. It is a theory the district court rejected and one this court must as well.

The shakedown at the heart of this case is simple enough. Robert Vigil served as New Mexico's state treasurer. According to the complaint, he wanted to make sure a political rival didn't challenge him in the next election. So he and his deputy, Ann Marie Gallegos, allegedly hatched a plan to find work for the rival's wife, Samantha Sais, as a sort of payoff. When Mr. Vigil and Ms. Gallegos solicited bids for a state contract, the complaint says, they insisted that

any interested contractor hire Ms. Sais on any terms she wished. The plaintiff, SECSYS, agreed to the plan in principle but ultimately found it couldn't close the deal with Ms. Sais — she wanted 40% of SECSYS's gross income from the state contract; SECSYS was only willing to give her 40% of the net. When negotiations broke down, Mr. Vigil and Ms. Gallegos allegedly went with another contractor who agreed to pay Ms. Sais what she wanted. For his role in this scheme, Robert Vigil eventually found himself indicted, then convicted, and then serving prison time. *See United States v. Vigil*, 523 F.3d 1258 (10th Cir. 2008).

While the scheme that gave rise to this suit is simple enough, SECSYS's theory of recovery is anything but. SECSYS seeks damages from Mr. Vigil and Ms. Gallegos not for violating state contracting law, not for violating state common law, not for violating any federal statute. Instead, SECSYS says the pair must pay because they violated the company's Fourteenth Amendment right to equal protection of the laws.

How is equal protection implicated? According to SECSYS, Mr. Vigil and Ms. Gallegos unlawfully discriminated against the company when they refused to give the state contract to bidders who refused to pay Ms. Sais's full demand. To be sure, SECSYS admits (as it must) that it was willing to meet the defendants' extortionate demand at least half way — after all, the company offered Ms. Sais most of what she sought. So that leaves SECSYS with the remarkable argument that it was discriminated against in violation of the federal Constitution not

because it was unwilling to pay, but because it was willing to pay only *some* of an allegedly extortionate demand.

SECSYS pursues its unusual claim by way of 42 U.S.C. § 1983. That statute, of course, allows citizens to sue those who violate their constitutional rights while acting "under color of" state law. One might wonder how Mr. Vigil's and Ms. Gallegos's alleged acts of extortion — acts that no doubt violate many state laws — might be characterized as taken "under color of" state law. But, of course, that's exactly how § 1983 has been long read (though over the occasional objection). *See Monroe v. Pape*, 365 U.S. 167 (1961); *id.* at 224-58 (Frankfurter, J., dissenting); *Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting). The defendants before us do not seek to revisit the site of that battle or dispute their conduct was state action for purposes of the Fourteenth Amendment. Neither do they invoke the defense of qualified immunity, which would shield them from liability for their official acts unless they violated clearly established federal law.

Instead, the parties come to us fighting only over the question whether Mr. Vigil's and Ms. Gallegos's actions, accepting them as state action under color of law, violated the Equal Protection Clause. And on that question SECSYS not only complains that the district court erred when it granted summary judgment to the defendants on its equal protection claim. The company also complains that the court erred in how it went about analyzing the case. In SECSYS's view, the

district court erred by refusing to apply "traditional" class-based equal protection principles and applying instead so-called "class of one" doctrine. But as it happens there's nothing to any of the company's complaints. However analyzed, the district court's disposition was undoubtedly the right one. Why this is so, however, takes some explanation.

Equal protection is the law's keystone. Without careful attention to equal protection's demands, the integrity of surrounding law all too often erodes, sometimes to the point where it becomes little more than a tool of majoritarian oppression. *Cf. Dred Scott v. Sandford*, 60 U.S. 393 (1857); *Plessy v. Ferguson*, 163 U.S. 537 (1896). But when equal protection's demands are met, when majorities are forced to abide the same rules they seek to impose on minorities, we can rest much surer of the soundness of our legal edifice. "[N]o better measure [exists] to assure that laws will be just than to require that laws be equal in operation." *Railway Exp. Agency v. New York*, 336 U.S. 106, 112-13 (1949) (Jackson, J., concurring).

At the same time, it is of course important to be precise about what equal protection is and what it is not. "Equal protection of the laws" doesn't guarantee equal results for all, or suggest that the law may never draw distinctions between persons in meaningfully dissimilar situations — two possibilities that might themselves generate rather than prevent injustice. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271-73 (1979). Neither is the equal protection promise

some generic guard against arbitrary or unlawful governmental action, merely replicating the work done by the Due Process Clause or even the Administrative Procedure Act. *See Snowden v. Hughes*, 321 U.S. 1, 8 (1944). Instead, the Equal Protection Clause is a more particular and profound recognition of the essential and radical equality of all human beings. It seeks to ensure that any classifications the law makes are made "without respect to persons," that like cases are treated alike, that those who "appear similarly situated" are not treated differently without, at the very least, "a rational reason for the difference." *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 602 (2008) (quotations omitted).

Toward that end, what SECSYS conceives of as "traditional" class-based equal protection jurisprudence generally proceeds in two steps.

First, we ask whether the challenged state action intentionally discriminates between groups of persons. *Washington v. Davis*, 426 U.S. 229, 240 (1976); *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987); *Feeney*, 442 U.S. at 272-74; *Snowden*, 321 U.S. at 8. Discriminatory intent, however, "implies more than intent as volition or intent as awareness of consequences." *Feeney*, 442 U.S. at 279. It requires "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of'" the law's differential treatment of a particular class of persons. *Id.*; *see also Vacco v. Quill*, 521 U.S. 793, 803 (1997) (noting that "[t]he law has long used actors' intent or

- 6 -

purpose to distinguish between two acts that may have the same result"); *Model Penal Code* § 2.02 (distinguishing between intent or purpose and knowledge); *United States v. Manatau*, 647 F.3d 1048, 1050-51 (10th Cir. 2011) (same). So a discriminatory effect against a group or class may flow from state action, it may even be a foreseen (or known) consequence of state action, but it does not run afoul of the Constitution unless it is an intended consequence of state action. *Feeney*, 442 U.S. at 279; *see also Village of Arlington Heights v. Metro. Housing Corp.*, 429 U.S. 252 (1977). Congress is of course free to supplement the Constitution's equal protection guarantee (and sometimes has) with statutes aimed at rooting out merely foreseen or even unintended discriminations. But for a constitutional violation to take place, an intent to discriminate must be present.

Intentional discrimination can take several forms. When a distinction between groups of persons appears on the face of a state law or action, an intent to discriminate is presumed and no further examination of legislative purpose is required. *Snowden*, 321 U.S. at 8; *Shaw v. Reno*, 509 U.S. 630, 642 (1993). By contrast, when the law under review is generally applicable to all persons, no presumption of intentional discrimination arises; proof is required. This is so because many laws, perhaps most and often unavoidably, effect some groups of persons differently than others even though they involve no *intentional* discrimination. Some persons, for example, will be better able to perform a generally applicable aptitude test designed to measure competence for a particular

- 7 -

government job, or better able to fill out universally mandated paperwork necessary to establish entitlement to a benefit. Yet none of this necessarily betokens an intent to discriminate against the burdened group (the failed job seekers, the poor paperwork performers). *See, e.g.*, *Davis*, 426 U.S. at 248 (explaining that facially neutral "tax, welfare, public service, regulatory, and licensing statutes" requiring the payment of money to the government "may be more burdensome to the poor" than to the rich but are rarely constitutionally problematic); *Feeney*, 442 U.S. at 271-72 ("many [laws] affect certain groups unevenly, even though the law itself treats them no differently"). In these cases, the government may intend only to hire the most capable employees or to prevent fraud by demanding complete paperwork, even as it foresees (knows) the means it has chosen to accomplish this intent will visit harms on certain groups who will struggle to or refuse to meet the law's demands. Disparate impact, then, is not necessarily the same thing as discriminatory intent. *Davis*, 426 U.S. at 248; *Feeney*, 442 U.S. at 272.

At the same time, bitter experience teaches that even rules of general application *can* harbor lurking discriminatory purposes. One need look no further in our history for an example than the poll tax, nominally applicable to all but designed (intended) to prevent African-Americans from voting in the Jim Crow era. So while laws of general applicability may not be subject to a presumption of intentional discrimination, neither are they shielded from scrutiny. If the

evidence shows that a generally applicable law was adopted at least in part because of, and not merely in spite of, its discriminatory effect on a particular class of persons, the first essential step of an equal protection challenge is satisfied. *Feeney*, 442 U.S. at 279. Of course, few are anxious to own up to a discriminatory intent and direct evidence of discrimination is hard to come by. Instead, courts often must draw inferences about a law's intent or purpose from circumstantial evidence. And a starkly disparate impact — while not itself automatically or presumptively unlawful — may well inform a court's investigation into the law's underlying intent or purpose. *See id.* at 273 ("when a neutral law has a disparate impact upon a group that has historically been the victim of discrimination, an unconstitutional purpose may still be at work"); *Davis*, 426 U.S. at 248.

Even generally applicable laws initially enacted with entirely proper (non-discriminatory) purposes can themselves later become tools of intentional discrimination in the course of their enforcement. In *Yick Wo v. Hopkins*, 118 U.S. 356, (1886), the paradigmatic example of this line of cases, the Court faced a law barring the operation of commercial laundries in wood buildings without a permit. This generally applicable law would have been perfectly unobjectionable (an attempt to control the fires that plagued San Francisco in the nineteenth century), but for the fact that all two hundred Chinese operators were denied a permit while seventy-nine out of eighty white operators received authorization.

From this evidence the Court was easily able to infer that the selective enforcement was purposeful, not merely incidental, discrimination against those of Chinese descent. *Id.* at 374-75; *see also United States v. Armstrong*, 517 U.S. 456, 465-66 (1996).

Second, and after an act of intentional discrimination against a particular group is identified either by presumption or evidence and inference, courts ask whether the state's intentional decision to discriminate can be justified by reference to some upright government purpose. The law, after all and again, may take cognizance of *meaningful* distinctions between individuals without violating the constitutional command of treating similarly situated persons similarly. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439-40 (1985) (the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike"); *cf.* John Hart Ely, *Democracy and Distrust* 30-31 (1980) ("Obviously all unequal treatment by the state cannot be forbidden."). In determining whether distinctions between individuals are "meaningful," the degree of judicial scrutiny varies. Laws intentionally discriminating against historically ostracized groups — African-Americans, women, illegitimate children, for example — are, experience teaches, so rarely defensible on any ground other than a wish to harm and subjugate that they always come to us under grave suspicion and subject to heightened review. *See Feeney*, 442 U.S. at 272-73. Laws selectively burdening fundamental rights are also "carefully

scrutinized." *See Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 98-99 (1972).

But laws discriminating between groups on other bases, where there is less reason from historical experience to suspect a meaningless classification, are reviewed to see if the distinctions they draw between persons are at least rational. *Cleburne*, 473 U.S. at 440. In any case, though, and whatever the applicable standard of review, the aim is always to ensure that, while persons in dissimilar situations may be treated differently, the law treats like alike.

With the elements of "traditional" class-based equal protection analysis now in hand, it quickly becomes clear that SECSYS's claim gets hung up at the very first (intentional discrimination) hurdle. To be sure, SECSYS attempts to argue otherwise, suggesting that the defendants' extortionate demand intentionally discriminated against the "class" of individuals who weren't willing to pay up (at least in full). But the putative policy SECSYS complains of — the extortionate demand that anyone who wants a state contract must pay Ms. Sais her price — applied generally to all bidders. The policy wasn't like a rule saying African Americans or women may not bid for a state contract or that only those of a certain religious faith may. The defendants' rule applied equally to all, drawing no distinctions between groups of persons, thus implicating no presumption of intentional discrimination.

And that leaves SECSYS in a tight spot. It leaves SECSYS with, at most, a generally applicable rule that had a disparate impact on those who weren't willing

or able to pay the defendants' — full — demand. To make out an equal protection violation in these circumstances, SECSYS must point to evidence that the defendants enforced their extortionate rule with the purpose of discriminating against those who wouldn't comply — because of, not in spite of, its disparate effect on that class of persons.

This is evidence that neither SECSYS nor most victims of extortion schemes can muster. A tax might burden the poor more than the rich, but *Davis* tells us this result is usually at most a foreseen (but unintended) side effect of the government's goal to raise revenue for its own programs and services. 426 U.S. at 248. And, ironically enough, precisely the same principle holds for most public extortion schemes. Corrupt state employees usually shakedown members of the public with the purpose of enriching themselves or their friends, not to discriminate intentionally against anyone, not *because of* the scheme's effects on anyone who refuses to play along. Both taxes and extortionate demands are, after all, traditionally aimed (intended) at extracting funds from private individuals in return for something — an illegal, private favor, in extortion's case, a legal and public benefit in taxation's case; and some historians even go so far as to suggest that our modern nation-states, together with their systems of taxation, got their start long ago as little more than extortion rackets in which individuals paid tribute in return for protection. *See, e.g.*, Charles Tilly, *War-Making and State Making as Organized Crime*, *in* <u>Bringing the State Back In</u> 175-76 (Peter B.

Evans et. al, eds., 1985); *id.* at 169 (describing nascent nation-states as "quintessential protection rackets with the advantage of legitimacy").

In any event, the facts of our case illustrate just how much an equal protection analysis of extortion parallels *Davis* and its analysis of tax schemes that (foreseeably but unintentionally) happen to burden some more than others. According to SECSYS, the defendants allegedly wanted to mollify Ms. Sais's husband, to prevent him from challenging Mr. Vigil in an election. As means to that end, they gave a state contract to someone besides SECSYS because that other bidder was willing to hire Mr. Sais on terms that made her happy. There's no evidence the defendants enforced this extortionate demand with the purpose of discriminating against those who failed to meet it, *because of* an adverse impact on this class of persons. Much to the contrary, any damage done to those who refused the defendants' demand was collateral damage, a foreseen but unintended side effect of the defendants' purpose of securing sufficient funds for their own private ends. Indeed, every indication in the record before us suggests the defendants would have been just as happy if SECSYS had met its full demand as it was when another bidder eventually did so.

It is for (at least) this reason that SECSYS's "traditional" class-based equal protection claim fails. There's little question the defendants would have a difficult time (at best) trying to justify their extortion as rational policy at the second step of the equal protection analysis, if one were to get there. Clearly, the

defendants' alleged scheme is unlawful and unrelated to any upright end. But it has never been the case that "every denial of a right conferred by state law involves a denial of the equal protection of the laws." *Snowden*, 321 U.S. at 8. Before a court may get to the business of assessing the rationality of a challenged state action, some evidence of intentional discrimination against a particular class of persons must be present: "The unlawful administration by state officers of a state statute . . . is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination." *Id*. And evidence of that sort simply isn't present in the traditional extortion racket, however unlawful and improper that racket may be. It is for this simple reason SECSYS's novel claim finds no antecedents in our lengthy equal protection tradition and why it will secure no place there today.

Analyzing the case through equal protection's so-called "class of one" doctrinal prism changes nothing. Class of one doctrine focuses on discrimination not between classes or groups of persons, as "traditional" equal protection doctrine does, but on discrimination against a specific individual. *Engquist*, 553 U.S. at 601. Even so, the familiar principles and procedures associated with equal protection class discrimination doctrine apply. *Id*. at 602 ("class-of-one theory . . . [is] not so much a departure from" as it is "an application of" traditional equal protection principles).

In fact, a plaintiff raising a class of one claim must proceed through essentially the same two steps a plaintiff alleging a class-based claim must. First, the class of one plaintiff must show he or she (as opposed to a class in which he is a member) was "intentionally treated differently from others similarly situated." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Second, when intentional discrimination is shown to exist the plaintiff must prove there is no "rational basis" for it. *See id.* at 564-65 (state action described as "irrational and wholly arbitrary"). Admittedly, some of our class of one precedents have rejected claims because the plaintiff had failed to show that other "similarly situated" individuals were treated differently. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1219-20 (10th Cir. 2011); *Jennings v. City of Stillwater*, 383 F.3d 1199, 1213-15 (10th Cir. 2004). But the emphasis on the absence of similarly situated individuals treated differently is, of course, simply a way of saying that the plaintiff failed at the first step to prove intentional discrimination, as *Olech* requires. After all, and as we've seen, in the typical equal protection case the plaintiff will not be able to show that the challenged rule discriminates on its face or that direct evidence of discrimination exists. Those who wish to use the law to discriminate against others are often wilier than that. Often, an equal protection plaintiff will be able to show intentional discrimination only by circumstantial evidence, usually in the form of an inference of discrimination arising from the fact that his or her adverse treatment was such a stark outlier from an otherwise

consistent pattern of favorable treatment in similarly situated cases. *See, e.g.*, *Olech*, 528 U.S. at 564-65; *Davis*, 426 U.S. at 242.

Beyond the two-part test described in *Olech*, the parties fight over whether a class of one plaintiff must satisfy an additional, third element to state a claim for relief. According to Mr. Vigil and Ms. Gallegos, a class of one plaintiff must prove that they (the defendants) harbored not only an intent to discriminate without a rational basis but also some additional and "exploitative" or "vicious" "motive." SECSYS, of course, disputes any such inquiry into motive is required — and in this much at least the company appears to have the better of it. The line between what the law calls intent and motive is, of course, not always easily drawn — most "motives," after all, can be recharacterized (perhaps more aptly) as further (or less immediate) intended ends or objectives. *See Wade Pediatrics v. Dept. of Health and Human Servs.*, 567 F.3d 1202, 1205 (10th Cir. 2009); *see also* Wayne LaFave, Substantive Criminal Law § 5.3(a) (2008). Neither has equal protection's concern traditionally been with motive (further intentions) in class-based claims. For example, a law expressly precluding women from voting or taking certain jobs intentionally singles them out for differential treatment and is constitutionally problematic whether the law happens to be "motivated" by a hatred of women, or by some antiquated paternalistic notion that they are "too good" for such things, or by something else altogether. No proof of an exploitative or vicious motive (further intent) is required. To trigger the first part

of the equal protection test, it's enough to say that the governmental action intentionally discriminates between persons; the adequacy of the reasons for that discrimination are then and separately assessed at equal protection's second step (under heightened or rational basis review). Given that this is how traditional class-based claims are analyzed, it is perhaps unsurprising that *Olech* expressly eschews an inquiry into motive in the parallel world of class of one claims, stating that its rule is focused on rooting out "intentional" discrimination and does *not* require inquiry into the defendant's "subjective motivation[s]" or further intentions. 528 U.S. at 565.

Even so, some agree with the defendants before us and argue that, unless we demand proof of some vicious or exploitative motive in class of one cases, the floodgates of liability will open too wide. By way of example, they say, any police officer who arbitrarily tickets one speeding driver but not another traveling at the same rate could face an equal protection claim unless we require heightened proof of a nefarious motive at work. *See Bell v. Duperrault*, 367 F.3d 703, 712-13 (7th Cir. 2004) (Posner, J., concurring) (arguing for an "exploitative" or "vicious" motive requirement); *but see Racine Charter One, Inc. v. Racine Unified School Dist.*, 424 F.3d 677, 684 (7th Cir. 2005) (questioning use of motive in the Seventh Circuit). But not only does such a rule run afoul of *Olech*'s plain direction, traditional equal protection principles of intentionality are sufficient to address the perceived problem. Sufficient because an officer who

selects speeders at random because he cannot pull over everybody doesn't possess an *intent* to single out any particular person *because of* who he or she is. True, the officer acts with volition. True, the officer knows that the effect of his actions will be differential treatment for different speeding drivers. But as *Feeney*, 442 U.S. at 279, *Davis*, 426 U.S. at 248, and *Snowden*, 321 U.S. at 8-9, explain, equal protection doctrine requires more than that. It requires a particular intent, an *intent* to discriminate, in this example an intent to pull over a particular individual *because of* his or her identity. And plainly no such intent exists in these circumstances and so no constitutional problem arises in need of even rational basis (let alone heightened) scrutiny.

It is also precisely for this reason that SECSYS's class of one claim falters. The defendants' putative rule in this case (pay Ms. Sais everything she wants) applied to all bidders just the same. Without any differential treatment embodied in the challenged rule, no presumption of intentional discrimination arises. Neither, for reasons already discussed above, does a classic extortion scheme like this involve facts that could possibly prove (whether directly or circumstantially) an intent to discriminate. Whatever the defendants' motives or further intentions may have been is beside the point; they lacked an intent to discriminate and that is enough to foreclose SECSYS's equal protection claim, whether analyzed through the prism of class-based or class of one doctrine.

To be sure, there may be still other problems with SECSYS's claim. This case invites the question, for example, whether class of one doctrine should apply at all in the government contracting context. In *Engquist*, the Supreme Court held the doctrine will not apply to situations in which the government acts as employer. 553 U.S. at 598-600, 605-06. And it is arguably just a small step from that conclusion to the conclusion the doctrine shouldn't apply when the government interacts with independent contractors — in both circumstances, the government acts in a more proprietorial and less regulatory capacity. *See Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1273-74 (11th Cir. 2008). But whether *Engquist* reaches this far we need not decide today because even if class of one doctrine applies fully and vigorously in the government contracting world, SECSYS's claim falls of its own weight.

The district court's grant of summary judgment to the defendants is affirmed. Because our analysis depends not at all on the district court's admission of certain challenged affidavits, that issue is moot, as are SECSYS's arguments about the disposition of its own motion for summary judgment.

No. 11-2006, *SECSYS, LLC v. Vigil*

**MURPHY**, Circuit Judge, and **BRORBY**, Senior Circuit Judge, concurring in the result.

Viewing the evidence in the light most favorable to SECSYS, and drawing all reasonable inferences in its favor, *Foster v. AlliedSignal, Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002), the record in this case reveals the defendants-appellants did not intentionally discriminate against SECSYS. This fully resolves SECSYS's "traditional" and "class of one" equal protection claims. *Washington v. Davis*, 426 U.S. 229, 240 (1976); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Accordingly, I concur in the result.