**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 28, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KARRI DALTON, as the personal
representative of the estate of Nikki
Bascom, and next friend to M.B., a
minor child and A.C., a minor child,

Plaintiff - Appellee,

v.

CHIEF ED REYNOLDS; CAPTAIN
RICKY VILLALOBOS,

Defendants - Appellants,

and

TOWN OF SILVER CITY; GRANT
COUNTY; THE ESTATE OF
MARCELLO CONTRERAS; DEPUTY
JACOB VILLEGAS; SGT. FRANK
GOMEZ; DETECTIVE ADAM
ARELLANO,

Defendants.

No. 19-2047

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 2:17-CV-01143-WJ-GJF)**

---

Cody R. Rogers (Mark D. Standridge with him on the briefs), Jarmie & Rogers,
P.C., Las Cruces, New Mexico, for Appellants.

Laura Schauer Ives (Joseph P. Kennedy and Adam C. Flores with her on the
brief), Kennedy Kennedy & Ives, PC, Albuquerque, New Mexico, for Appellee.

Before **TYMKOVICH**, Chief Judge, **LUCERO**, Senior Circuit Judge, and **BACHARACH**, Circuit Judge.

**TYMKOVICH**, Chief Judge.

This case arose after a Silver City police officer murdered his ex-girlfriend, Nikki Bascom, and then committed suicide. Her Estate sued, alleging the Silver City police did not adequately respond to Ms. Bascom's domestic violence complaints because the shooter, Marcello Contreras, was a fellow police officer. The Estate brought various civil rights claims under 42 U.S.C. § 1983, including a claim that Silver City officers Ed Reynolds and Ricky Villalobos violated Ms. Bascom's equal protection rights by providing her less police protection than other similarly situated domestic violence victims. The officers filed a motion for summary judgment on qualified immunity grounds, and, as relevant here, the district court denied their motion as to the equal protection claim.

Exercising our limited jurisdiction under 28 U.S.C. § 1291, we affirm the district court's denial of summary judgment to officers Reynolds and Villalobos.[1] A reasonable jury could find their conduct violated Ms. Bascom's clearly established right to equal protection of the law.

---

[1] *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) ("[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.").

# I. Background

## A. Before the Murder-Suicide[2]

In 1999, Marcello Contreras's then-wife,[3] Nikki Bascom, reported to the Silver City Police Department (SCPD) that Contreras had threatened to shoot her at gunpoint because he believed she was having an affair. Contreras admitted pushing his wife but denied threatening her. SCPD charged him with battery on a household member.[4] Nevertheless, in 2001, SCPD hired him as a police officer. Although Contreras held this position with SCPD for fifteen years, his time with SCPD was not without controversy. In 2003, SCPD investigated allegations that Contreras had sexually abused a child, but SCPD ultimately concluded the allegations were unsubstantiated.[5]

---

[2] Because this is an interlocutory appeal from a denial of qualified immunity, we must accept the district court's findings of fact unless they are "blatantly contradicted by the record." *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 757 (10th Cir. 2013). Neither party has alleged any such contradiction, so we defer to the district court's factual findings. App. 318–325.

[3] From the 1990s to 2016, Contreras and Ms. Bascom had married, divorced, and then dated again. At the time of the murder-suicide in 2016, they were not dating.

[4] The record does not indicate how this charge was resolved.

[5] The documentation of the investigation has since disappeared. After Ms. Bascom's murder, SCPD came to possess a memory card that contained apparent child pornography, including images of Contreras, in uniform, exposing himself to young girls. App. 321.

Then on March 9, 2016, Ms. Bascom's thirteen-year-old son called 911 to report that Contreras and Ms. Bascom were arguing—yet again about an affair suspected by Contreras—and Contreras was threatening to shoot himself. Three SCPD officers, including Sergeant Joseph Arredondo, responded to the call. But their handling of the incident was ostensibly one-sided in favor of protecting Contreras, not Ms. Bascom.

When the officers arrived on the scene, Ms. Bascom handed Sergeant Arredondo a gun she had taken from Contreras and said "[Contreras] has gone crazy and wants to kill himself." App. 321. Ms. Bascom informed Sergeant Arredondo that Contreras had been drinking heavily for two days. Sergeant Arredondo observed that Contreras had alcohol on his breath and had bloodshot, watery eyes. Despite Sergeant Arredondo being "one of the number one DWI go-getters that makes most of [SCPD's] DWI arrests," he allowed Contreras—who had clearly consumed alcohol recently—to drive his truck into the driveway. *Id*. at 321.

The officers also acted contrary to SCPD training and policy. Although SCPD officers are trained to interview the 911 caller in a domestic incident, the officers on the scene did not interview Ms. Bascom's son. Moreover, no officer completed a verbal tracking form, which department policy requires so that officers are aware of volatile situations.

Finally, dispatch initially classified the call as a "domestic disturbance." *Id*. Minutes later, the call type was changed to a "welfare check" at the request of one of the responding officers. *Id.* The dispatcher explained that the call type was changed to protect Contreras. This change made it more difficult for agencies to detect a history of domestic violence at the residence. From 2008 to 2016, this was the only time a domestic disturbance call was changed to another according to the Grant County Regional Dispatch Authority.[6]

Sergeant Arredondo reported the domestic disturbance incident to Chief Reynolds. Chief Reynolds met with Contreras and suggested he take advantage of the employee assistance program. But Contreras was not charged with any offenses—domestic violence, refusal to obey an officer, or DWI—as a result of the incident.

About two weeks later on March 25, 2016, Ms. Bascom called Chief Reynolds to report that Contreras had followed her in his car and also harassed a co-worker, D.N., at a Walgreens.[7] Ms. Bascom asked Chief Reynolds to prevent Contreras from harassing her co-worker. Chief Reynolds contacted Contreras and told him to "knock it off" and that any further incidents would impact his job. No

---

[6] Silver City, New Mexico, is located within Grant County.

[7] Though the district court did not make a finding to this effect, we note for context that Contreras believed Ms. Bascom was in a romantic relationship with the co-worker. App. 149–50.

officer documented the incident in a verbal domestic violence form, conducted an internal investigation, or referred the matter to an outside agency.

Chief Reynolds met with Contreras on March 28, 2016, and promoted him to acting Captain and gave him a raise.

### B. The Murder-Suicide

On April 21, 2016, Contreras, while on duty and in an SCPD patrol car, forced Ms. Bascom off the road by swerving in front of her car. When she tried to call 911, he took her cell phone. Contreras then went to the home of Ms. Bascom's co-worker, D.N., and said, "I'm telling you right now you haven't seen the last." *Id*. at 322.

Meanwhile, Ms. Bascom went to the SCPD police station to report the incident. She told Chief Reynolds that Contreras was harassing her and had taken her phone. Chief Reynolds sent Captain Villalobos to D.N.'s home to ensure he was safe. Captain Villalobos later called Chief Reynolds and told him that Contreras had threatened Ms. Bascom's co-worker.

Captain Villalobos returned to the police station to take a statement from Ms. Bascom, who was still there. Despite Captain Villalobos's warning to Ms. Bascom that she could be charged with false reporting, Ms. Bascom told him that: (1) Contreras stopped her while driving by pulling his car quickly in front of hers and forcing her to the side of the road, (2) Contreras reached into her car and

-6-

grabbed her phone out of her hand when she was calling 911, and (3) she had changed the locks on her home and Contreras did not have a key.

While Captain Villalobos took Ms. Bascom's statement at the station, Chief Reynolds met with Contreras in Ms. Bascom's home to notify him that he was being placed on administrative leave.[8]  Chief Reynolds took Contreras's service weapon.  Contreras admitted that he was angry, that he had followed Ms. Bascom and D.N. that morning, that he had pulled over Ms. Bascom and confronted her, and that he had grabbed her cell phone and left.  He also admitted he had gone to D.N.'s house and confronted him.

Chief Reynolds later testified that he believed Contreras's actions "could constitute a criminal act" and a complaint could have been filed against Contreras.  *Id*. at 323.  Chief Reynolds did not inquire whether Contreras had any other weapons when he put him on leave but testified that he assumed Contreras did.  Chief Reynolds returned to the police station and recounted the meeting to Ms. Bascom, who was angry that Chief Reynolds left Contreras in her home "with all those guns."  *Id*.  Captain Villalobos told Chief Reynolds about Ms. Bascom's report.[9]

---

[8]  Without a key to Ms. Bascom's home, Contreras broke in through the back door.  App. 28.

[9]  Chief Reynolds claimed he intended to refer Contreras's alleged cell phone theft and false imprisonment to an outside agency, but neither he nor anyone at SCPD did so before Ms. Bascom was killed.

On her way home from the police station, Ms. Bascom called 911 to report that Contreras was following her again. Grant County Sheriff's Department (GCSD) officers responded and spoke to both Ms. Bascom and Contreras. Chief Reynolds called GCSD Sergeant Gomez, and although Chief Reynolds knew that GCSD officers were at Ms. Bascom's home, he did not tell GCSD about Contreras's prior conduct.

Later, on her way to a domestic violence shelter, Ms. Bascom called 911 to report that Contreras was following her there. She checked in to the domestic violence shelter at about 1:45 p.m. Around the same time, Sergeant Yost of GCSD was patrolling the area around D.N.'s house because of Contreras's alleged threats. Sergeant Yost started following Contreras, and then around 3:30 p.m., Sergeant Yost called Captain Villalobos and Chief Reynolds and told them he was following Contreras but did not feel that he had enough information to stop him. Chief Reynolds did not tell Sergeant Yost about Contreras's reported theft of Ms. Bascom's cell phone and false imprisonment of Ms. Bascom.

Ms. Bascom left the domestic violence shelter and drove to her friend's house. As he had done many times that day, Contreras followed her there. At 4:20 p.m., Contreras shot and killed Ms. Bascom in front of her friend's house and then turned the gun on himself. Afterwards, Sergeant Yost told dispatch that he should have stopped Contreras and that he could have saved Ms. Bascom's

life. The dispatcher responded, "[W]e have been dealing with this off and on for over a month now, and it's been swept under the rug." *Id*. at 325.

### C. SCPD Policies

When these events occurred, Chief Reynolds had been the SCPD chief since 2005 and was the policymaker for SCPD. Per SCPD's domestic violence policy, officers are required to "make an arrest if the officer has probable cause to believe that the person has committed or is committing any crime." *Id*. at 319. The policy further states:

> Arrest is the preferred response to family violence because arrest offers the greatest potential for ending the violence[.] When a domestic violence crime has occurred, ONLY with extenuating circumstances and the Watch Commander's approval will an arrest not be made. In that instance, a written police report will be made articulating the specific reasons why an arrest was not made.

*Id.*

In training, SCPD officers learn that in a domestic violence situation it "is very important whenever you have enough to make an arrest to make an arrest." *Id.* If the domestic violence assailant is not present in order to effect an arrest, officers are instructed to issue an arrest warrant as soon as possible. When officers do not have enough cause to make an arrest, they are instructed to obtain an emergency protective order. In other words, under SCPD's domestic violence policy, "verbal incident tracking is always required, an arrest (or an arrest

-9-

warrant) upon probable cause is always required, and officers are obviously forbidden from actively concealing allegations of domestic abuse." *Id.* at 186.

In contrast, SCPD's Internal Investigation Policy—as approved by Chief Reynolds—requires serious criminal allegations against an officer to be referred to an outside agency. Domestic violence crimes are categorized as "serious" crimes. *Id.* at 318. The IIP does not address when to arrest an SCPD officer. When SCPD makes a referral to an outside agency, and in order to "keep it clean," SCPD provides only the name of the complainant and the alleged criminal violation. *Id.* at 320. It does not disclose witnesses or any other information.

### D. Prior Enforcement

In 2016, the year Ms. Bascom was murdered, 149 domestic violence calls resulted in 140 arrests by SCPD officers—an arrest rate of 94 percent. In its briefing before the district court, the Estate identified eight domestic violence complaints where the assailant either (1) pulled a victim over by swerving in front of the victim's car or (2) pulled a cell phone out of the victim's hand. In all of these cases, SCPD officers either arrested the assailant at the scene, signed a criminal complaint, or sought an arrest warrant. SCPD officers also arrested domestic violence offenders in relatively minor disputes and even arrested and charged domestic violence suspects over victims' objections, as mandated by SCPD policy.

### E. Procedural History

Kerri Dalton, on behalf of Ms. Bascom's children and estate, sued SCPD, Chief Reynolds, Captain Villalobos, and the Town of Silver City. The Estate alleged, among other things, that Chief Reynolds and Captain Villalobos (Officers) violated Ms. Bascom's clearly established right to equal protection of the law in violation of 42 U.S.C. § 1983. The Officers moved for summary judgment on the basis of qualified immunity. The district court denied their motion because it found that a reasonable jury could conclude the Officers violated Ms. Bascom's right to equal protection of the law and that right was clearly established at the time of the Officers' conduct.

Specifically, the district court determined that Ms. Bascom received disparate treatment in violation of her right to equal protection compared to other domestic violence victims because (1) the Officers admitted that Contreras's actions could constitute crimes and a criminal complaint could have been filed, (2) Contreras admitted to Chief Reynolds facts that could constitute larceny and false imprisonment, (3) Contreras was not criminally investigated, and an arrest warrant was not pursued, and (4) the matter was not referred to GCSD, despite the fact that GCSD was in active contact with SCPD. App. 329. Next, the district court determined that a reasonable jury could find the Officers acted with discriminatory intent in violation of Ms. Bascom's right to equal protection because the Officers followed facially discriminatory policies and because Ms.

-11-

Bascom's treatment was a "stark outlier" compared to how SCPD treated other similarly situated domestic violence victims. *Id*. at 331. Finally, the district court concluded Tenth Circuit case law clearly established that providing less police protection to a sub-class of domestic violence victims, as compared to other domestic violence victims, violates the Equal Protection Clause. Accordingly, the district court denied qualified immunity to the Officers on the Estate's equal protection claim.

The Officers filed this interlocutory appeal from that denial of qualified immunity, alleging it was not clearly established that their conduct violated Ms. Bascom's right to equal protection of the law.

## II. Analysis

### A. Legal Standard

We review denials of a qualified immunity defense de novo. *See Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301 (10th Cir. 2009). Because this is an interlocutory appeal from the denial of qualified immunity, our jurisdiction is limited to reviewing the district court's abstract legal conclusions. *Fogarty v. Gallegos*, 523 F.3d 1147, 1153–54 (10th Cir. 2008). We have jurisdiction "to review (1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, [and] (2) whether that law was clearly established at the time of the alleged violation." *Roosevelt-Hennix*, 717 F.3d at 753. Whether the pretrial record sets forth a "genuine" issue of fact for

-12-

trial is not an abstract legal question, so we lack jurisdiction to review a district court's ruling on such a matter. *Johnson v. Jones*, 515 U.S. 304, 320 (1995). In conducting this analysis, we must leave the district court's factual findings undisturbed unless the district court's accepted facts are "blatantly contradicted by the record[] so that no reasonable jury could believe [them]." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

Section 1983 provides that "[e]very person who, under color of [law] . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Here, the Estate alleges the Officers violated Ms. Bascom's constitutional right to equal protection of the law by violating SCPD's domestic violence enforcement policies.

"Equal protection is essentially a direction that all persons similarly situated should be treated alike." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 659 (10th Cir. 2006). "[T]o assert a viable equal protection claim, [a] plaintiff[] must first make a threshold showing that [she was] treated differently from others who were similarly situated to [her]." *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998). Upon this showing, she must then demonstrate that the state actor's differential treatment of her cannot pass the appropriate standard of scrutiny.

-13-

Different types of equal protection claims call for different forms of review. Relevant here, a claim that a state actor discriminated on the basis of a non-suspect classification calls for rational basis scrutiny. *See Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109–10 (10th Cir. 2008). Thus, we ask whether the government's classification bears "a rational relation to some legitimate end." *Id.* at 1110.[10] A traditional class-based equal protection claim also requires a showing of intentional discrimination. *See SECSYS, LLC v. Vigil*, 666 F.3d 678, 685 (10th Cir. 2012). "When a distinction between groups of persons appears on the face of a state law or action, an intent to discriminate is presumed and no further examination of the legislative purpose is required." *Id*.

Even when discriminating intentionally and without a rational basis, government defendants sued under § 1983 in their individual capacities may assert a qualified immunity defense. *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993). Qualified immunity shields police officers from "damages liability for the performance of their discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable [officer] would have known." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011). "We employ a two-part test to analyze a qualified immunity defense," asking "whether the facts that a plaintiff has alleged make out a violation of a

---

[10] The Officers do not contend they had a rational basis to treat Ms. Bascom differently from other domestic violence victims.

constitutional right, and whether the right at issue was clearly established at the time of [the officer's] alleged misconduct." *Id.*

Whether a right is "clearly established" is an objective inquiry. *Id.* A right is clearly established when "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This inquiry is designed "to ensure that . . . officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. *Brown*, 662 F.3d at 1164.

Our inquiry in this case is thus two-fold: We must determine (1) whether the facts found by the district court show that the Officers' conduct violated Ms. Bascom's right to equal protection of the law and (2) whether that right was clearly established at the time of the Officers' conduct.

### B. Equal Protection Claim

We find that the facts found by the district court support an equal protection claim. Although Ms. Bascom was similarly situated to other domestic violence victims, she was treated differently because her assailant was a police officer with whom she had been in a domestic relationship. When other domestic violence victims reported domestic violence to SCPD, the non-police officer

assailant was arrested 94 percent of the time. When Ms. Bascom and her son repeatedly reported Contreras's domestic violence to SCPD, Contreras was never arrested. Instead, the Officers brushed SCPD domestic violence policy aside to protect their fellow police officer. A reasonable jury could conclude these facts demonstrate disparate treatment of domestic violence victims whose assailants were not police officers and whose assailants were police officers with whom they had been in a domestic relationship.

And because of this disparate treatment that does not implicate a fundamental right or a suspect class, rational basis review is appropriate. *Price-Cornelison*, 524 F.3d at 1110. Though rational basis review often spells failure for a claimant, it is not toothless. *See Schweiker v. Wilson*, 450 U.S. 221, 234 (1981). Here, the Officers have offered no rational reason to decline police protection to certain domestic violence victims but to afford it to others, and we can think of none.

Finally, the Officers' discriminatory intent may be inferred from their actions pursuant to the facially discriminatory SCPD policies. *See SECSYS*, 666 F.3d at 685. SCPD has two domestic violence policies: one for victims whose assailants are SCPD officers, and one for everyone else. SCPD's "general public" domestic violence policy requires responding officers to arrest the suspect upon a finding of probable cause unless there are extenuating circumstances and the watch commander agrees. App. 327. Based on this policy, nearly all domestic

-16-

violence calls in 2016 resulted in arrests. *Id.* In contrast, SCPD's Internal Investigations Policy mandates that any "serious" allegation against an SCPD officer be referred to an outside agency. The policy categorizes "domestic violence" crimes as "serious." *Id.* When such a referral is made, the IIP stipulates that only the name of the complainant and alleged criminal violation be sent to the outside agency. The outside agency does not receive any additional information provided by the victim or gathered by officers during the SCPD investigation. *Id.* at 327. The policy does not have an exception for exigent circumstances or any provision for when to arrest an SCPD officer. *Id.*

Thus, according to SCPD policies at the time of Ms. Bascom's murder, domestic violence victims of non-SCPD police officers received robust police protection, including mandatory arrests, while domestic violence victims of SCPD police officers did not. Because the Officers admitted they were acting according to these facially discriminatory policies in Ms. Bascom's case, discriminatory intent may properly be inferred. *See, e.g.*, *Price-Cornelison*, 524 F.3d at 1113 ("[I]t is reasonable to infer . . . that, in refusing to enforce [the plaintiff's] permanent protective order, [the officer] was acting pursuant to that [discriminatory] policy.").

On these facts and upon de novo review, then, the Officers violated Ms. Bascom's constitutional right to equal protection of the law because Ms. Bascom's disparate treatment by the Officers is not a legitimate end and we may

-17-

infer discriminatory intent from the facially discriminatory policies the Officers followed.

The Officers resist these conclusions, but we do not find their arguments persuasive. Specifically, the Officers challenge the district court's factual determination that they treated Ms. Bascom differently from similarly situated persons. In their view, Ms. Bascom was not similarly situated for equal protection purposes because she was not similarly situated in all relevant respects to other domestic violence victims. The Officers assert Ms. Bascom was unique in that she was "a domestic violence victim in a relationship with a law enforcement officer." Aplt. Br. at 27. That may be so, but similarly situated does not mean identical. Indeed, to state an equal protection claim, a plaintiff generally must allege membership in a sub-class of people receiving disparate treatment. And of course, that sub-class will necessarily have at least one common distinguishing characteristic among sub-class members—that is, the one that defines who is part of the sub-class.[11] Accordingly, this argument is without merit.

Next, the Officers claim the Estate "did not enumerate any fundamental right implicated in this matter, nor did [it] show that Ms. Bascom was a member

---

[11] For example, if an elderly plaintiff brought an equal protection claim alleging he or she was discriminated against in college admissions due to his or her age, the defendant-University could not claim the elderly plaintiff was not similarly situated in "all relevant respects" to the other younger candidates because of age.

of a protected class, either of which is necessary to allege a viable Equal

Protection claim." Aplt. Br. at 28. The right implicated in this case flows from

the Equal Protection Clause of the Fourteenth Amendment. As we explained in

*Watson v. City of Kansas City, Kan.*, "[a]lthough there is no general constitutional

right to police protection, the state may not discriminate in providing such

protection." 857 F.2d 690, 695 (10th Cir. 1988); *see also Price-Cornelison*, 524

F.3d at 1113 (same); *Eckert v. Town of Silverthorne*, 25 Fed. App'x. 679, 684

(10th Cir. 2001) (same); *Est. of Macias v. Ihde*, 219 F.3d 1018, 1028 (9th Cir.

2000) (same); *Soto v. Flores*, 103 F.3d 1056, 1066 (1st Cir. 1997) (same);

*Eagleston v. Guido*, 41 F.3d 865, 878 (2d Cir. 1994) (same); *Hynson By &*

*Through Hynson v. City of Chester Legal Dep't*, 864 F.2d 1026, 1031 (3d Cir.

1988) (same). The Estate argues, and we agree based on the facts found by the

district court, that the Officers violated this principle by providing less police

protection to Ms. Bascom than to other victims of domestic violence whose

assailants were not police officers with whom they had been in a domestic

relationship.

Because a reasonable jury could conclude the Officers violated Ms.

Bascom's constitutional right to equal protection of the law, we must next

determine whether that right was clearly established.[12]

---

[12] We affirm the district court based on the traditional equal protection
analysis, so we need not address the district court's alternative holding that Ms.

(continued...)

-19-

## C. *Clearly Established Law*

At the time of the Officers' conduct, it was clearly established in this circuit that it is unlawful to provide less police protection to a sub-class of domestic violence victims, like those whose assailants were police officers with whom they had been in a domestic relationship. We held in *Watson* that providing less police protection to victims of domestic violence than to victims of non-domestic violence can form the basis of an equal protection violation. 857 F.2d at 694. There, the plaintiff sued various Kansas City police officers, claiming they failed to protect her and her son from domestic abuse at the hands of her husband, another Kansas City police officer. Plaintiff had repeatedly called the Kansas City Police Department to report her husband's domestic assaults, but instead of arresting Officer Watson, the police referred plaintiff's complaints to an "Internal Affairs Unit." *Id.* at 692. We concluded plaintiff had stated a viable equal protection claim because in domestic assault cases, unlike in other assault cases, Kansas City police officers were trained to "attempt to 'defuse' the situation and to use arrest as a last resort." *Id.* at 696.

---

[12](...continued)
Bascom's right to equal protection was also violated based on a class-of-one theory. *See, e.g.*, *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("Our cases have recognized successful equal protection claims . . . where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.").

Subsequently, in *Price-Cornelison*, 524 F.3d at 1113, we held that providing less police protection to a sub-class of domestic violence victims —there, lesbian victims—violates the Equal Protection Clause. In that case, the plaintiff claimed a police officer "deprived her of equal protection of the law when he refused to enforce both her emergency and permanent protective orders to the same extent that he enforced protective orders obtained by heterosexual victims of domestic violence." *Id.* at 1110. We concluded *Watson* "was sufficient to put [the officer] on notice that providing [the plaintiff with] less police protection than other domestic violence victims because she is a lesbian would deprive her of equal protection of the law[.]" *Id.* at 1114–15.

Despite this precedent, the Officers argue that in the absence of a Tenth Circuit or Supreme Court case identifying the specific sub-class of persons at issue here—namely, persons domestically abused by police officers with whom they had been in a domestic relationship—the Estate's equal protection claim must fail. They argue *White v. Pauly*, 137 S. Ct. 548 (2017), demands a higher showing of factual similarity before a case clearly establishes that particular conduct violates a constitutional provision. But our circuit *has* clearly established precedent that police officers may not intentionally discriminate in providing police protection to domestic violence victims. *See, e.g.*, *Watson*, 857 F.2d at 695; *Eckert*, 25 Fed. App'x. at 684; *Price-Cornelison*, 524 F.3d at 1113; *accord* *Brooks v. Knapp*, 221 F. App'x 402, 409 (6th Cir. 2007) ("This court has

indirectly acknowledged claims for discrimination against domestic violence victims as a protected class."); *Beltran v. City of El Paso*, 367 F.3d 299, 304 (5th Cir. 2004) ("[C]ertain intentionally discriminatory policies, practices, and customs of law enforcement with regard to domestic assault and abuse cases may violate the Equal Protection Clause."); *Navarro v. Block*, 72 F.3d 712, 717 (9th Cir. 1995) ("[E]ven absent evidence of gender discrimination, the [plaintiffs'] equal protection claim still survives because they could prove that the domestic violence/non-domestic violence classification fails even the rationality test.").

Here we have two factually similar cases, *Watson* and *Price-Cornelison*, which clearly established at the time of the Officers' conduct that providing less protection to domestic violence victims, or certain sub-classes of domestic violence victims, violates the Equal Protection Clause. These cases would put a reasonable officer on notice that it is unlawful to provide less police protection to victims of domestic violence whose assailants are police officers with whom they had been in a domestic relationship than is provided to victims without police assailants.

\* \* \*

In sum, the Estate has satisfied both prongs necessary to overcome the Officers' qualified immunity defense. Based on the facts found by the district court, the Officers violated Ms. Bascom's clearly established equal protection right to the same police protection as other domestic violence victims.

-22-

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of summary judgment to officers Reynolds and Villalobos and REMAND for further proceedings.