**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**January 10, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

CITIZENS FOR CONSTITUTIONAL
INTEGRITY; SOUTHWEST
ADVOCATES, INC.,

     Plaintiffs - Appellants,

v.

UNITED STATES OF AMERICA; THE
OFFICE OF SURFACE MINING
RECLAMATION AND
ENFORCEMENT; DEBRA HAALAND,
in her official capacity as Secretary of the
Department of the Interior; GLENDA
OWENS, in her official capacity as Acting
Director of the Office of Surface Mining
Reclamation and Enforcement; KATE
MACGREGOR, in her official capacity as
Acting Assistant Secretary for Land and
Minerals Management,

     Defendants - Appellees.

No. 21-1317

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:20-CV-03668-RM-STV)**
_____

Jared S. Pettinato, The Pettinato Firm, Washington, D.C., for Plaintiffs - Appellants.

Martin Totaro, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice (Brian
M. Boynton, Acting Assistant Attorney General, Cole Finegan, U.S. Attorney, Michael S.
Raab and Benjamin M. Shultz, Attorneys, Appellate Staff, Civil Division, with him on the
brief), Washington, D.C., for Defendants - Appellees.
_____

Before **HOLMES**, Chief Judge, **MURPHY**, and **HARTZ**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Plaintiffs Citizens for Constitutional Integrity and Southwest Advocates, Inc. appeal the rejection of their challenges to the constitutionality of the Congressional Review Act, 5 U.S.C. §§ 801–08 (the CRA or the Act), and Senate Rule XXII, the so-called Cloture Rule, which requires the votes of three-fifths of the Senate to halt debate. We reject their challenges to the CRA and hold that they lack standing to challenge the Cloture Rule.

The CRA was enacted in 1996 to enhance congressional oversight of executive rulemaking. Among other things, it creates an expedited process through which Congress can repeal rules promulgated by federal agencies. Under the Act a rule "shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule." 5 U.S.C. § 801(b)(1). (A joint resolution is effectively the same as a bill except in the context of proposing constitutional amendments.[1]) After it is passed by Congress, a joint resolution of disapproval must

---

[1] "Congress legislates through 'acts' and 'joint resolutions.' Resolutions are recognized in the Constitution, and a joint resolution is a bill within the meaning of the congressional rules and the processes of the Congress. With the exception of joint resolutions proposing amendments to the Constitution, all such resolutions are sent to the President for approval and have the full force of law." *Int'l Bhd. of Elec. Workers v. Wash. Terminal Co.*, 473 F.2d 1156, 1163 (D.C. Cir. 1972); *accord Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1301, 1309 (D.C. Cir. 2004) (per curiam) ("There is no question that [a joint] [r]esolution is a law, enacted in accordance with the bicameralism and presentment requirements of Article I, section 7, clause 3 of the Constitution."); *United States v. Powell*, 761 F.2d 1227, 1235 (8th Cir. 1985) (en banc)

then go to the President for approval; a presidential veto can be overridden in the manner typical of all legislation. *See id.* § 801(a)(3)(B)(i) (recognizing Congress's authority to override a presidential veto of a joint resolution of disapproval). A rule subjected to a joint resolution of disapproval "may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule." *Id.* § 801(b)(2). The Act applies only to recently adopted regulations. Congress generally has 60 days from when a final rule is reported to Congress[2] to enact a joint resolution of disapproval. *See id.* § 802(a). But a rule reported to Congress within 60 days of the end of a session of Congress is treated as if it were published on "the 15th session day" (in the Senate) or "the 15th legislative day" (in the House) "after the succeeding session of Congress first convenes," *id.* § 801(d)(1)–(2)(A),[3] thus providing Congress with an extended

---

("The fact that the words at the top of the first page of a law are 'a bill' instead of 'a joint resolution' is of significance only for internal congressional purposes. A joint resolution, once signed by the President, is every bit as much of a law as a bill similarly signed."). And "like all other statutes," a joint resolution "is subject to the President's veto." *Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400, 404 (D.C. Cir. 1990).

[2] "Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—(i) a copy of the rule; (ii) a concise general statement relating to the rule, including whether it is a major rule; and (iii) the proposed effective date of the rule." 5 U.S.C. § 801(a)(1)(A).

[3] Because the 60 days does not include "days either House of Congress is adjourned for more than 3 days during a session of Congress," *id.* § 802(a), the new session may be able to consider regulations promulgated many months before the end of the prior session. *See* Anne Joseph O'Connell, *Agency Rulemaking and Political Transitions*, 105 Nw. U. L. Rev. 471, 531 (2011) ("[A]ccording to the Congressional

opportunity to repeal so-called "midnight regulations" promulgated by an outgoing administration.

Once a proposed CRA resolution is "referred to the committees in each House of Congress with jurisdiction," *id.* § 802(b)(1), the Senate's consideration of the resolution is expedited in several ways. If the committee to which a joint resolution of disapproval has been referred "has not reported such joint resolution (or an identical joint resolution) at the end of 20 calendar days after" the rule's publication, a petition signed by 30 Senators can force the discharge of the resolution from the committee, "and such joint resolution shall be placed on the calendar," *id.* § 802(c); in contrast, for most other legislation, there is "no specific provision in the standing rules of the Senate providing for a definite procedure for the discharge of its committees from further consideration of the matters referred to them." Floyd M. Riddick & Alan S. Frumin, *Riddick's Senate Procedure: Precedents and Practices*, S. Doc. No. 101-28, at 802 (Alan S. Frumin ed., rev. ed. 1992). Once a joint resolution of disapproval is reported by (or discharged from) a committee, "it is at any time thereafter in order . . . for a motion to proceed to the consideration of the joint resolution, and all points of order against the joint resolution (and against consideration of the joint resolution) are waived. The motion is not subject to amendment, or to a motion to postpone, or to a motion to proceed to the consideration of other business." 5 U.S.C. § 802(d)(1). If the motion to proceed is approved, "the joint resolution shall remain the unfinished

---

Research Service, any final rule submitted to Congress after May 14, 2008, likely could have been repealed by the new Congress under the CRA.").

4

business of the Senate until disposed of." *Id.* Senate debate on a joint resolution of disapproval is "limited to not more than 10 hours," *id.* § 802(d)(2), thereby overriding the Cloture Rule, which provides that the question whether to end debate "shall be decided in the affirmative by three-fifths of the Senators duly chosen and sworn." To date, the CRA has been used to overturn 20 rules, with the "vast majority" of disapprovals coming during the first months of a new presidential administration. Maeve P. Carey & Christopher M. Davis, Cong. Rsch. Serv., R43992, *The Congressional Review Act (CRA): Frequently Asked Questions* 6 (2021), https://sgp.fas.org/crs/misc/R43992.pdf.

One such rule was the Stream Protection Rule, 81 Fed. Reg. 93,066 (Dec. 20, 2016) (the Rule), promulgated by the Department of the Interior's Office of Surface Mining Reclamation and Enforcement (the Office) in the waning days of the Obama Administration. Within a month of the Stream Protection Rule taking effect on January 19, 2017, both Houses of Congress had passed a joint resolution disapproving the Rule, and President Trump had signed the joint resolution into law. *See* 163 Cong. Rec. H859 (daily ed. Feb. 1, 2017) (passing H.J. Res. 38); *id.* at S632 (daily ed. Feb. 2, 2017) (same, by a margin of 54–45, with one Senator not voting); Act of Feb. 16, 2017, Pub. L. No. 115–5, 131 Stat. 10.

The Stream Protection Rule, which the Office issued using authority granted to it by the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 et seq., heightened the requirements for regulatory approval of mining-permit applications. *See* Stream Protection Rule, 81 Fed. Reg. at 93,068–69 (overview of the

5

Rule's seven major components). According to Plaintiffs, the repeal of the Rule enabled the approval of a 950.55-acre expansion of the King II Coal Mine (the Mine), located in La Plata County, Colorado, and owned by GCC Energy.[4] The Office (jointly with the Bureau of Land Management) released an environmental assessment regarding the projected effects of the Mine's expansion. Relying on that assessment, the Department of the Interior approved the Mine's expansion on March 27, 2018.

On December 15, 2020, Plaintiffs filed suit in the United States District Court for the District of Colorado against the federal government and several high-ranking Department of the Interior officials in their official capacities (collectively, Defendants). They sought (1) a declaration that the CRA and the Cloture Rule are unconstitutional and that the Stream Protection Rule is therefore valid and enforceable; (2) vacation of the approval of the King II Mine permit modification and an injunction against expanded mining activities authorized by the modification; and (3) attorney fees. On August 30, 2021, the district court granted Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *See Citizens*

---

[4] The federal government has regulatory responsibility for the Mine. Although Colorado has primary authority to regulate "surface coal mining and reclamation operations . . . on non-Federal and non-Indian lands" within its borders, 30 C.F.R. § 906.10, most of the land for both the preexisting Mine and the area added by the expansion is "'split-estate' land[] where the federal government has retained ownership of the subsurface coal (and other minerals), but has disposed of the surface estate. The Ute Mountain Ute (UMU) Tribe owns much of the split-estate surface in this area." Aplts. App., Vol. I at 31. "While the split-estate surface owned by the UMU Tribe is not within a designated Indian Reservation, it does meet the definition of 'Indian Lands' as defined by the [Surface Mining Control and Reclamation Act]," so the Office is "the primary regulator of coal mining operations" for those lands. *Id.*

*for Const. Integrity v. United States*, No. 20-cv-3668-RM-STV, 2021 WL 4241336, at *1 (D. Colo. Aug. 30, 2021). Plaintiffs timely appealed. We review de novo the district court's grant of the motion to dismiss. *See Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1278 (10th Cir. 2021).

On appeal Plaintiffs assert that the CRA is facially unconstitutional on separation-of-powers, equal-protection, and substantive-due-process grounds, so the joint resolution disapproving the Stream Protection Rule was invalid, the Rule must be reinstated, and the approval of the Mine's expansion must be vacated. We disagree. The procedures instituted by the CRA—which Congress enacted "as an exercise of the rulemaking power of the Senate and House of Representatives, respectively," 5 U.S.C. § 802(g)(1)—are fully compatible with the provisions of the United States Constitution governing how Congress can pass laws; and the CRA survives Plaintiffs' other constitutional challenges. Plaintiffs raise similar challenges with respect to the Cloture Rule, but they lack standing to pursue the matter. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the dismissal by the district court. Before addressing the merits, we explore our jurisdiction to hear the appeal.

## I.    JURISDICTION

"To reach the merits of a case, an Article III court must have jurisdiction." *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950 (2019). We have an "independent obligation" to assure ourselves of our subject-matter jurisdiction "even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

### A.     Appellate Jurisdiction

In district court this case was consolidated with a second one under Federal Rule of Civil Procedure 42(a)(2), but this case was appealed separately. We sua sponte asked the parties to "address with particularity in their merits briefs the jurisdictional issue of finality with respect to the appeal of an apparently final decision applicable to only one of the two consolidated cases." Order, *Citizens for Const. Integrity v. United States*, No. 21-1317 (10th Cir. Sept. 30, 2021). All responded that each case retained its separate identity and that the district court's dismissal of this case was a final decision for purposes of appeal under 28 U.S.C. § 1291, even though the second case remained pending at the time. We agree. The Supreme Court has recently stated that "one of multiple cases consolidated under [Rule 42(a)(2)] retains its independent character, at least to the extent it is appealable and finally resolved, regardless of any ongoing proceedings in the other cases." *Hall v. Hall*, 138 S. Ct. 1118, 1125 (2018). Thus, "when one of several consolidated cases is finally decided, a disappointed litigant is free to seek review of that decision in the court of appeals." *Id.* at 1131. That is what happened here.

### B.     Statutory Jurisdiction

Although not mentioned by the parties, there is also a potential restriction on our statutory jurisdiction to hear this case. The CRA contains a jurisdiction-stripping provision: "No determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. "'Under this chapter' refers to duties the CRA imposes on various actors, whether those duties take the form of determinations,

findings, actions, or omissions." *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1235 (10th Cir. 2020) (court lacks jurisdiction to determine whether agency rule is invalid because agency failed to submit the rule to Congress as required by the CRA). The joint resolution disapproving the Stream Protection Rule was an "action under this chapter" within the meaning of § 805, because the CRA's special procedures facilitated its passage through Congress. Hence, § 805, read literally, deprives this court of jurisdiction here. *See Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 561 (9th Cir. 2019) (jurisdiction-stripping provision of CRA "[o]n its face . . . bars judicial review of all challenges to actions under the CRA").

Nevertheless, the federal courts are reluctant to cede their power to enforce the Constitution absent an unambiguous congressional command. "[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988); *accord Cmty. Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 352–53 (10th Cir. 1989) ("[J]udicial review of colorable constitutional claims remains available unless Congress has made its intent to preclude review crystal clear."). The Supreme Court requires "this heightened showing in part to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster*, 486 U.S. at 603 (internal quotation marks omitted).

Section 805 does not meet this clear-statement requirement. It is not enough just to bar judicial review in general, as the Supreme Court has repeatedly ruled when holding that such a general bar does not preclude the courts from entertaining

9

constitutional challenges. *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 516–17 (2003) (immigration statute providing that "[n]o court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole" did not bar habeas corpus action challenging the constitutionality of legislation requiring plaintiff's detention without bail); *INS v. St. Cyr*, 533 U.S. 289, 314 (2001) (neither the Antiterrorism and Effective Death Penalty Act of 1996 nor the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 deprived federal courts of jurisdiction over an alien's application for habeas relief under 28 U.S.C. § 2241; the absence of "another judicial forum" for such claims, "coupled with the lack of a clear, unambiguous, and express statement of congressional intent to preclude judicial consideration on habeas of such an important question of law, strongly counsel[ed] against adopting a construction that would raise serious constitutional questions"), *superseded by statute in part as recognized by Nasrallah v. Barr*, 140 S. Ct. 1683, 1690 (2020) (in the REAL ID Act of 2005, Congress "responded to" *St. Cyr* and "clarified that final orders of removal may not be reviewed in district courts, even via habeas corpus, and may be reviewed only in the courts of appeals"); *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 678–81, 681 n.12 (1986) (statute providing that "[n]o action against the United States, the Secretary [of Health and Human Services], or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter" did not bar statutory or constitutional challenges to regulations promulgated by the Secretary; this "disposition avoid[ed] the serious

constitutional question that would arise" if the Court had held that there was no "judicial forum for constitutional claims arising under Part B of the Medicare program" (internal quotation marks omitted)); *Johnson v. Robison*, 415 U.S. 361, 365 n.5, 366–74 (1974) (statute providing that the decisions of the Administrator of Veterans Affairs "on any question of law or fact under any law . . . providing benefits for veterans . . . shall be final and conclusive and no . . . court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise" did not bar constitutional challenges brought by conscientious objector); *cf. Webster*, 486 U.S. at 594, 599–605 (statute providing that the CIA director "may, in his discretion, terminate the employment of any officer or employee of the Agency whenever he shall deem such termination necessary or advisable in the interests of the United States" barred Administrative Procedure Act challenges to individual employee discharges, but did not bar constitutional due-process, equal-protection, and privacy claims).

We agree with the Ninth Circuit that because § 805 "does not include any explicit language barring judicial review of constitutional claims" relating to the CRA, "we presume that Congress did not intend to bar such review." *Ctr. for Biological Diversity*, 946 F.3d at 561; *see Kan. Nat. Res. Coal.*, 971 F.3d at 1237 (citing *Center for Biological Diversity* with approval on this point). Plaintiffs exclusively bring constitutional claims, so we have statutory jurisdiction to hear this case.

### C.    Standing

Under Article III, § 2 of the Constitution the federal courts have jurisdiction only over cases and controversies. "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (brackets, ellipses, and internal quotation marks omitted). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks omitted). "Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element" of standing. *Spokeo v. Robins*, 578 U.S. 330, 338 (2016) (ellipsis and internal quotation marks omitted).

An organization has standing to sue on behalf of its members if "(a) [at least one of] its members would otherwise have standing to sue in [her] own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual

members in the lawsuit." *Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 840 (10th Cir. 2019) (internal quotation marks omitted); *see also Utah Ass'n of Cntys. v. Bush*, 455 F.3d 1094, 1099 (10th Cir. 2006) (one member with standing is sufficient). If one appellant has standing, we need not worry about the standing of another appellant raising the same issues and seeking the same relief. *See Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017); *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006). We first address standing to challenge the CRA.

### 1.  Standing to Challenge the CRA

In our view, Southwest Advocates may bring its challenge to the constitutionality of the CRA. With respect to the requirements of organizational standing, "the second and third conditions are unquestionably satisfied here" because "protecting the environment is a core purpose of [Southwest Advocates] and the relief it seeks does not require the participation of individual members." *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1241 (10th Cir. 2021). Therefore, we need decide only whether a member of the organization has standing in her own right. We conclude that member Julia Dengel has standing.

Ms. Dengel submitted a declaration to the court, which we may properly consider in determining jurisdictional facts. *See Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020). According to the declaration she lives on 45 acres of land south of Hesperus, Colorado, not far from the Mine. She takes daily walks through her neighborhood, during which she encounters many different species of plants and

13

animals. She fears that an expanded Mine "will divert more water from the La Plata River," thereby reducing the amount of wildlife "living near [her] or migrating through." Aplts. App., Vol. II at 176. Ms. Dengel has a well on her property whose water derives from a coal seam and currently is consumable only by the horses that she boards. She worries that expanding the Mine would cause "contaminants" to seep "into the source of [her] well water," thereby making the water undrinkable even by horses— with the consequence that "boarding or owning horses on [her] own land [would become] untenable." *Id.*

First, the harms that concern Ms. Dengel constitute bona fide injuries in fact. The Supreme Court and this court have repeatedly "held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (internal quotation marks omitted); *see also, e.g.*, *Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 1133, 1152 (10th Cir. 2022); *Utah Physicians*, 21 F.4th at 1241; *Diné Citizens*, 923 F.3d at 841; *WildEarth Guardians v. U.S. BLM*, 870 F.3d 1222, 1231 (10th Cir. 2017). "[O]nce an interest has been identified as a 'judicially cognizable interest' in one case, it is such an interest in other cases as well (although there may be other grounds for granting standing in one case but not the other)." *In re Special Grand Jury 89–02*, 450 F.3d 1159, 1172 (10th Cir. 2006). At this stage of the litigation, the declaration sufficiently establishes a "substantial risk" that allowing the Mine's expansion to proceed will

14

threaten the ecosystem around her home and preclude Ms. Dengel from boarding horses on her property. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).

Second, the asserted injuries can be traced to Defendants because they approved the source of her concerns, the Mine's expansion. It does not matter that "the environmental and health injuries claimed by [Ms. Dengel] are not directly related to the constitutional attack on the [CRA]." *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 78 (1978). What matters is that, but for the CRA, Ms. Dengel's injuries would not befall her. *See WildEarth Guardians*, 870 F.3d at 1232 ("[T]he legal theory and the standing injury need not be linked as long as redressability is met.").

Third, Ms. Dengel has satisfactorily alleged that her injuries would "likely be redressed by a favorable decision." *Clinton v. City of New York*, 524 U.S. 417, 435 (1998). If we were to hold that the CRA is unconstitutional, the joint resolution disapproving the Stream Protection Rule would be rendered invalid, and the resulting resurrection of the Stream Protection Rule would stop GCC Energy from operating the portion of the Mine located on the 950.55 acres added by the challenged permit. *Cf. INS v. Chadha*, 462 U.S. 919, 936 (1983) ("If the veto provision violates the Constitution, and is severable, the deportation order against Chadha will be cancelled. Chadha therefore has standing to challenge the order of the Executive mandated by the House veto.").

15

### 2. Standing to Challenge the Cloture Rule

On the other hand, both Plaintiffs lack standing to challenge the constitutionality of the Cloture Rule. Southwest Advocates lacks standing because it has not adequately alleged how the environmental harm of which it complains would be redressed by a ruling that the Cloture Rule is unconstitutional. Even if the Cloture Rule is unconstitutional, a decision to that effect would not reinstate the Stream Protection Rule because the Cloture Rule was not invoked in the CRA process that disapproved the Stream Protection Rule. The joint resolution of disapproval passed notwithstanding the Cloture Rule, not because of it. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 995 F.3d 18, 22 (1st Cir. 2021) ("The problem with the plaintiffs' contention is that none of the relief that they seek would prevent any of the laws that they contend caused them pecuniary harm from continuing to have full force and effect.").

Southwest Advocates suggests that invalidation of the Cloture Rule could redress its harm because without the Cloture Rule it might be able to obtain legislation reinstating the Stream Protection Rule and revoking the permit for the expanded Mine. But that possibility is too speculative. It is not enough that a favorable ruling on a claim might just happen to redress harm. The Supreme Court has long made it clear that "it must be *likely*, as opposed to merely *speculative*, that the injury will be redressed by a favorable decision," *Lujan*, 504 U.S. at 561 (internal quotation marks omitted; emphasis added), and that to establish standing "pleadings must be something more than an ingenious academic exercise in the conceivable," *Warth v. Seldin*, 422 U.S. 490, 509 (1975) (internal quotation marks omitted). Where, as here, the "causal relation

between [the] injury and [the] challenged action depends upon the decision of an independent third party [such as Congress]," a plaintiff must plausibly allege "at the least that [the] third part[y] will *likely* react in predictable ways." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (internal quotation marks omitted; emphasis added); *accord US Magnesium, LLC v. U.S. EPA*, 690 F.3d 1157, 1166 (10th Cir. 2012) ("In a case like this, in which relief for the [plaintiff] depends on actions by a third party not before the court, the [plaintiff] must demonstrate that a favorable decision would create a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." (internal quotation marks omitted)); *cf. Skaggs v. Carle*, 110 F.3d 831, 836 (D.C. Cir. 1997) ("At most the [members of the House of Representatives challenging House Rule XXI(5)(c), which required a supermajority to approve certain tax increases] have shown that [the Rule] could, under conceivable circumstances, help to keep a majority from having its way—perhaps, for example, because a simple majority in favor of an income tax increase might not be prepared, for its own political reasons, to override the preference of the House leadership against suspending or waiving the Rule in a particular instance. But that prospect appears to be, if not purely hypothetical, neither actual nor imminent."). Plaintiffs have not alleged facts establishing that elimination of the Cloture Rule would significantly increase the likelihood that opponents of the Mine could garner the necessary majority in the Senate (to say nothing of a majority in the House and the support of the President) to halt the operation of the expanded Mine.

17

As for Citizens for Constitutional Integrity, it lacks standing to challenge the Cloture Rule because it has not alleged a judicially cognizable injury in fact. The group describes itself as "a nonprofit organization that develops and advocates for legislation, regulations, and government programs." Compl. ¶ 22. Its members are "citizens holding governments accountable to their constitutions," and it "watches for actions that contravene our bedrock, fundamental principles, circumstances, and motivations that drove the Founding Fathers and the people in drafting and adopting the Constitution." *Id.* Citizens for Constitutional Integrity is thus a quintessential "concerned bystander[]" seeking "vindication of [its members'] value interests." *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013) (internal quotation marks omitted) (rejecting standing of opponents of same-sex marriage). But "a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573–74. "The Constitution leaves" such grievances "for resolution through the political process." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 n.2 (1998).

Plaintiffs argue that a claim relating to "[t]he separation of powers requires no evidence of harm because it is a '*structural safeguard* rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified.'" Aplts. Reply Br. at 17 (quoting *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995)). But standing was not at issue in *Plaut*. In that case Congress had passed a law requiring

18

the reinstatement of federal securities actions that had been dismissed as untimely. *See Plaut*, 514 U.S. at 214–15. The Supreme Court held that the law violated the separation of powers because it "retroactively command[ed] the federal courts to reopen final judgments." *Id.* at 219. In stating that no "specific harm" or "risk of specific harm" was required to sustain a separation-of-powers argument, *id.* at 239, the *Plaut* Court merely sought to clarify that the general rule adopted by the Court—that Congress cannot set aside final judgments of the judiciary—applies regardless of whether one can identify a specific and immediate risk of harm to the separation of powers in a particular case. This categorical rule was justified as "a prophylactic device, establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict." *Id.* at 239. The opinion was addressing the elements of a separation-of-powers claim, not who can bring such a claim; it says absolutely nothing about easing the requirements of standing for separation-of-powers claims. Indeed, just two years later the Court indicated that standing would be examined more strictly when such claims are raised. It stated that its "standing inquiry has been *especially* rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines*, 521 U.S. at 819–20 (emphasis added); *accord Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

Because neither Plaintiff has standing to challenge the Cloture Rule, we do not reach the merits of Plaintiffs' arguments that relate solely to the Cloture Rule.

## II.     MERITS

Having satisfied ourselves of our jurisdiction to review Plaintiffs' constitutional challenges to the CRA, we now turn to the merits of those challenges. Plaintiffs argue that on its face the CRA "violate[s] the separation of powers, equal protection, and due process." Aplts. Br. at 69. None of these arguments has merit.

### A. Separation of Powers

Plaintiffs contend that the CRA and the Cloture Rule combine to "create a one-way ratchet," *id.* at 23, that "inexorably undermines, erodes, and chips away at Article II Executive Power," *id.* at 24–25, and therefore "violates the separation of powers," *id.* at 25. They reason that "[i]f Congress can rescind agency authorities with fifty-one votes in the Senate, but cannot delegate new authorities or redelegate those same authorities without sixty votes, agency authorities will inexorably decrease over time." *Id.* at 29–30. They lament that the use of the CRA to disapprove the Stream Protection Rule "gutted [the Office's] current rulemaking authority," *id.* at 33, and they contend that the resulting "chilling effect" will compel the Office and other agencies to "rationally decline to implement some rules" for fear of Congress disapproving those rules," *id.* at 34. They assert that "[r]eductions in agency authorities reduce Executive Power," *id.* at 36, and that "[a]lthough Congress can define and revise agency authorities, the separation of powers prevents Congress from impairing the Executive Branch in the performance of its constitutional duties," *id.* at 37 (internal quotation marks omitted). In their view the CRA, and the joint resolutions of disapproval passed through it, create such an impairment.

20

We are not persuaded. Plaintiffs' argument is based on the false premise that Congress impermissibly treads on executive authority when it passes laws overriding or overruling agency rules or interpretations, or when it limits the scope of past statutory delegations. A joint resolution adopted under the CRA is authorized by the same provisions of the Constitution that authorize all legislation. *See Int'l Bhd. of Elec. Workers*, 473 F.2d at 1163 ("Resolutions are recognized in the Constitution, and a joint resolution is a bill within the meaning of the congressional rules and the processes of the Congress."). If Congress disagrees with an agency rule, then Congress may pass a law overriding it; such a course of events is not a usurpation of *executive* power but instead a legitimate exercise of *legislative* power. Plaintiffs concede that Congress "[u]ndoubtedly . . . could reduce Executive Power one statute at a time." Aplts. Br. at 37. It makes no difference what internal parliamentary procedures Congress adopts in doing so, so long as Congress complies with the fundamental constitutional requirements of bicameralism (approval by both Houses of Congress) and presentment (submission to the President for approval). *See* U.S. Const. art. I, § 7. "Our task is simply to hold the Congress within the limits of the power given it by the Constitution, not to pass judgment on matters of legislative practice." *Powell*, 761 F.2d at 1235.

To be sure, the Supreme Court has held that several novel policymaking procedures adopted by Congress were unconstitutional as violations of the proper separation of powers. For example, the Line Item Veto Act enabled the President to partially repeal Acts of Congress unilaterally, contrary to the requirements of bicameralism and presentment in the enactment of legislation. *See Clinton*, 524 U.S.

21

at 436–49. The Immigration and Nationality Act unconstitutionally provided that one House of Congress could override an Attorney General's nondeportation decision. *See Chadha*, 462 U.S. at 945–59. And another statute unconstitutionally subjected decisions of a regional airport authority to a veto power held by nine members of Congress. *See Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 265–77 (1991). Nor may Congress directly interfere with an exclusive power of the President, such as the removal of the Comptroller General, *see Bowsher v. Synar*, 478 U.S. 714, 721–27 (1986), or the recognition of foreign nations and governments, *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10–32 (2015) (statute could not require the Secretary of State, upon request, to record on the passport of a citizen born in Jerusalem that the place of birth was Israel).

But the CRA contravenes none of these separation-of-powers prohibitions. At oral argument Plaintiffs' counsel conceded—correctly—that every CRA resolution, including the one used to disapprove the Stream Protection Rule, is enacted by a majority vote of both Houses of Congress and signed by the President, thus complying with the "single, finely wrought and exhaustively considered, procedure," *Chadha*, 462 U.S. at 951, of "bicameral passage followed by presentment to the President," *id.* at 954–55.[5] And regulation of surface coal mining is not one of "[t]he Executive's exclusive power[s]," *Zivotofsky*, 576 U.S. at 30, but instead is a creature of Congress's

---

[5] Plaintiffs also charge that the CRA "does not satisfy Article I, Section 7, because it allows no pocket-veto of [CRA] statutes." Aplts. Reply Br. at 4. But Plaintiffs have waived this argument because they did not raise it until their reply brief. *See White v. Chafin*, 862 F.3d 1065, 1067 (10th Cir. 2017).

"Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States," U.S. Const. art. IV, § 3, cl. 2, and its "Power . . . To regulate Commerce . . . among the several States, and with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3.

As stated by the Supreme Court, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Later limitation or withdrawal of statutory grants "by duly enacted legislation in an area where Congress has previously delegated managerial authority is not an unconstitutional encroachment on the prerogatives of the Executive; it is merely to reclaim the formerly delegated authority." *Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1162 (10th Cir. 2004) (emphasis omitted); *see Chadha*, 462 U.S. at 955 ("Congress must abide by its delegation of authority *until that delegation is legislatively altered or revoked*." (emphasis added)). The opposite is also true. If Congress wants the Office to reinstate the Stream Protection Rule, it can simply pass a law saying so. *See* 5 U.S.C. § 801(b)(2) (the CRA's prohibition of agencies issuing new rules that are "substantially the same" as previously disapproved rules does not apply if "the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule"). The CRA raises no separation-of-powers concerns.

## B. Equal Protection

We must also reject Plaintiffs' claim that the CRA denies equal protection.[6] A fundamental tenet of equal-protection analysis is that a cognizable claim must identify a class of persons disadvantaged by the government action. In other words, government action challenged on equal-protection grounds must "affect some groups of citizens differently than others." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008) (internal quotation marks omitted) (but recognizing that in the context of certain types of government decision-making the "group" may be a class of one); *see also Ross v. Moffitt*, 417 U.S. 600, 609 (1974) (equal protection "emphasizes disparity in treatment by [the government] between classes of individuals whose situations are arguably indistinguishable"); *Missouri v. Lewis*, 101 U.S. (11 Otto) 22, 31 (1879) ("[The Equal Protection Clause] means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances."); *Dalton v. Reynolds*, 2 F.4th 1300, 1308 (10th Cir. 2022) ("To assert a viable equal protection claim, a plaintiff must first make a threshold showing that she was treated differently from others who were similarly situated to her." (brackets and internal quotation marks omitted)); *Christy v. Hodel*, 857 F.2d 1324, 1331 (9th Cir. 1988) ("In order to subject a law to any form of review

---

[6] Although by its express language the Fourteenth Amendment's Equal Protection Clause applies to States rather than the federal government, the Supreme Court has long understood the Fifth Amendment's Due Process Clause to include an equal-protection component. *See, e.g.*, *United States v. Windsor*, 570 U.S. 744, 774 (2013); *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954).

under the equal protection guarantee, one must be able to demonstrate that the law classifies persons in some manner." (brackets and internal quotation marks omitted)).

For typical equal-protection claims, it is obvious what the characteristic at issue is, because the challenged law facially discriminates on the basis of some discernible trait. *See, e.g.*, *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 487–88 (1954) (race); *United States v. Virginia*, 518 U.S. 515, 520 (1996) (sex); *Graham v. Richardson*, 403 U.S. 365, 371 (1971) (citizenship). "When a distinction between groups of persons appears on the face of a state law or action, an intent to discriminate is presumed and no further examination of the legislative purpose is required." *Dalton*, 2 F.4th at 1308 (internal quotation marks omitted). The only questions are (1) what degree of judicial scrutiny applies to a distinction based on this trait, and (2) whether the classification at issue withstands such scrutiny. *See Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109–10 (10th Cir. 2008). In other cases the challenged government action does not explicitly or overtly treat the plaintiffs differently based on a particular characteristic. But we may deduce the existence of the requisite discriminatory intent by examining surrounding circumstances. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977) (evidence suggesting that an "invidious discriminatory purpose was a motivating factor" behind an official action or policy may include disparate impact, historical background, departures from normal procedures, and contemporary statements by policymakers).

The problem for Plaintiffs is that they cannot coherently describe a class of discriminated-against persons to which they (or, more precisely, their members)

25

belong. They declare that "[t]he Senate's two voting thresholds create two categories of citizens: 1. Citizens facing complex problems and protected by statutes that delegate authorities to agencies (fifty-one votes can rescind these laws)[;] and 2. Citizens facing simpler problems and protected by statutes directly (only sixty votes can rescind these laws)." Aplts. Br. at 43. As they put it, "The first classification includes citizens facing problems for which Congress delegated statutory authorities to agencies. Congress delegates authority to agencies when it faces complex conditions involving a host of details with which it cannot deal directly." *Id.* (brackets and internal quotation marks omitted). Plaintiffs contend that this grouping includes people protected by regulations such as the Stream Protection Rule. The second category, they say, "includes citizens who face less-complex issues that Congress can solve directly by statute without delegating to an agency." *Id.* at 44. Proffered examples of "simpler problems" are "immigration, minimum-wage, and campaign finance laws, which have perennially failed to gain enough votes to invoke the Cloture Rule." *Id.* at 43–44. Plaintiffs maintain that these classifications "are the type of unusual discriminations or indiscriminate imposition of inequalities that the Supreme Court rejects." *Id.* at 44 (internal quotation marks omitted).

Despite this rhetoric, we fail to see how to identify a specific person as being discriminated against by the CRA. The problems with making such an identification are manifold. To begin with, given the pervasiveness of federal regulation, one would be hard-pressed to distinguish between activities that can be directly regulated by Congress and those that require some delegation to government agencies. And the fact

26

that one is impacted by such regulation does not determine whether that person would be helped or harmed by the possibility of congressional review under the CRA. Any regulation—any law—will create winners and losers. And the general subject matter of the regulation itself will not tell us who benefits and who is harmed. An environmentalist may be happy with one environmental regulation and distressed by another. The "class of persons" discriminated against by the CRA will vary depending on what particular regulation is up for consideration by Congress; after all, the CRA could have an impact on any regulation promulgated by a federal agency. There will always be a multitude of regulations that could be affected by consideration under the CRA, and one person could simultaneously be in the discriminated-against class with respect to some regulations (regulations that the person wishes to protect against congressional review) and be in the discriminated-in-favor-of class with respect to others. In light of the neutrality of CRA procedures with respect to the content of regulations, there is simply no sensible way of delineating who is within the purported class of those discriminated against by that statute. And because Plaintiffs have failed "to demonstrate that the law classifies persons in some manner," we cannot "subject [the CRA] to *any* form of review under the equal protection guarantee" of the Fifth Amendment's Due Process Clause. *Christy*, 857 F.2d at 1331 (internal quotation marks omitted; emphasis added).

### C. Substantive Due Process

Finally, Plaintiffs contend that the CRA violates their right to substantive due process. They essentially concede that because the CRA does not implicate a

fundamental right, rational-basis review applies to this claim. Such a "highly deferential" standard of review, *Maehr v. U.S. Dep't of State*, 5 F.4th 1100, 1122 (10th Cir. 2021) (internal quotation marks omitted), is particularly appropriate given that the bailiwick of the CRA is the internal rulemaking of Congress, and each House of Congress has express constitutional authority to "determine the Rules of its Proceedings," U.S. Const. art. I, § 5, cl. 2. A law will be sustained under this tier of scrutiny if it is "rationally related to a legitimate governmental purpose." *Hodel v. Indiana*, 452 U.S. 314, 331 (1981); *accord Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002). A party challenging a law under rational-basis review must "negative every conceivable basis which might support it." *FCC v. Beach Commc'ns*, 508 U.S. 307, 315 (1993) (internal quotation marks omitted). Our assessment is limited to whether "it might be thought that the particular legislative measure was a rational way" to address the perceived "evil at hand." *Scarlett v. Air Methods Corp.*, 922 F.3d 1053, 1070 (10th Cir. 2019) (internal quotation marks omitted). Thus, "a legislative choice . . . may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315. "Where there are plausible reasons for Congress' action, our inquiry is at an end." *Id.* at 313–14 (internal quotation marks omitted). "[I]t is entirely irrelevant for constitutional purposes" whether the putative rational basis "actually motivated the legislature." *Id.* at 315.

There are several plausible reasons for the Senate to have different procedures for enacting ordinary legislation versus repealing agency-formulated rules. For one,

28

expedited procedures for the latter may enable more efficient congressional oversight of delegations to executive branch agencies, by allowing Congress to swiftly countermand agency actions that it perceives as unwise, unfounded, or otherwise unwanted. Maintaining Congress's primacy in lawmaking—including by overriding agency actions via duly enacted legislation—is a legitimate governmental purpose. Eliminating self-imposed roadblocks to the passage of legislation through an oft-unwieldy body, as the CRA does, is rationally related to this end. Other rational bases might include control of "midnight regulations" by lame-duck administrations, *cf.* Carey & Davis, *supra*, at 6 & n.28, and increasing oversight of rulemaking by independent agencies, *cf. id.* at 4–5. Any one of these rationales suffices individually.

Plaintiffs claim that in enacting the CRA, "Congress irrationally presumed pervasive agency misconduct," and therefore the CRA fails rational-basis review. Aplts. Br. at 54. They appear to contend that the presumption of regularity of actions by government agencies, *see Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." (internal quotation marks omitted)), creates a presumption that congressional measures to overturn agency action must be improperly motivated. And they claim that support for the proposition that there was improper motivation can be found in the statements of several members of Congress.

Plaintiffs' argument is fatally flawed in several respects. First, the statements of a few legislators concerning their motives for voting for legislation is a reed too thin

to support invalidation of a statute. As Chief Justice Warren wrote in *United States v. O'Brien*, 391 U.S. 367, 384 (1968), the Court will not "void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." And such invalidation is likely to be futile. As the Chief Justice said, "We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it." *Id.*

Plaintiffs' argument is also flawed because the presumption of regularity is inapplicable in this context. The presumption of regularity is an evidentiary hurdle for litigants seeking to challenge an agency's administration of legislative commands; it says nothing about the propriety of revising those legislative commands. When Congress sets aside an agency regulation through the CRA, it is not implying that the agency acted in any unlawful or improper manner in promulgating the regulation. It is simply saying that, as a matter of policy, Congress disapproves of the regulation. Indeed, if the regulation had been improperly promulgated, it could be set aside through litigation. If any presumption is to apply in evaluating the legitimacy of the CRA, it should be that the statute was enacted to address "undesirable" (in the eyes of Congress) regulation that was not subject to judicial correction.

The third flaw in Plaintiffs' argument is also dispositive. In challenging the CRA because of the alleged motive in enacting it, Plaintiffs are simply asking us not to apply rational-basis review, where actual motive is not to be considered. The reviewing court is only to assess whether there is a conceivable proper reason for the legislation, and "it is entirely irrelevant for constitutional purposes whether the conceived reason" for doing so "actually motivated the legislature." *Beach Commc'ns*, 508 U.S. at 315. The burden on those challenging the legislation is, as we have already said, to "negative every conceivable basis which might support it." *Id.* It is not enough to come up with some improper purpose. There is no substance to Plaintiffs' substantive-due-process challenge.

## III. CONCLUSION

"The [C]onstitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained. But within these limitations all matters of method are open to the determination of [each] house, and it is no impeachment of the rule to say that some other way would be better, more accurate, or even more just." *United States v. Ballin*, 144 U.S. 1, 5 (1892); *accord NLRB v. Noel Canning*, 573 U.S. 513, 551 (2014) (reaffirming *Ballin*).

Plaintiffs object to Congress's adoption of the CRA and the Senate's use of the Cloture Rule. They clearly believe "that some other way would be better, more accurate, or even more just." *Ballin*, 144 U.S. at 5. But that is not for them—or us—to

31

decide. The prerogative to change the Senate's rules of debate belongs to the Senate alone.

We **AFFIRM** the district court's order.